EXXON CORPORATION AND AFFILIATED COMPANIES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Exxon Corp. v. Commissioner
Docket Nos. 18618-89, 24855-89, 18432-90
United States Tax Court
T.C. Memo 1992-92; 1992 Tax Ct. Memo LEXIS 94; 63 T.C.M. (CCH) 2067; T.C.M. (RIA) 92092; February 13, 1992, Filed Held: Evidentiary motions addressed. Robert L. Moore, II, Jay L. Carlson, John B. Magee, Gerald Goldman, Thomas D. Johnston, Joseph O. Luby, and Craig D. Miller, for petitioner in docket Nos. 18618-89 and 18432-90. Buford P. Berry, Emily Ann Parker, Dennis J. Grindinger, George V. Larsen, and Joseph M. Incorvaia, for petitioner in docket No. 24855-89. Raymond L. Collins, Ana G. Cummings, Bernard B. Nelson, Avery B. Cousins III, John F. Eiman, Allan E. Lang, Alan Summers, William B. Lowrance, David A. Alvarez, James H. W. Insley, Roger Osburn, Emron M. Pratt, David J. Mungo, David P. Monson, Carol Bingham McClure, David E. Whitcomb, Mark Barnes, and Joyce E. Britt, for respondent. WHITAKER
WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: The issues to be decided in this phase of the instant proceeding involve various aspects of whether or not respondent's sections 61[2] and 482 adjustments are precluded by virtue of our holding in Procter & Gamble Co. v. Commissioner, 95 T.C. 323 (1990). More specifically, the Court in its Order of January 7, 1991 (Scope of Trial Order) ruled that only the following questions *95 are at issue during this phase: (1) Whether the transfer price of Saudi Arabian crude oil paid by petitioners' offtakers [3] was below the prices charged for non-Saudi crude oil of similar grade or quality; (2) if the answer to question (1) is in the affirmative, whether the transfer price charged by the offtakers to the other subsidiaries of each petitioner or to unrelated third parties was below the price charged for non-Saudi crude oil of similar grade or quality; (3) if the answers to questions (1) and (2) are in the affirmative, whether the reduced price was caused by the restrictions imposed by Saudi Arabia which petitioners, their offtakers, and other subsidiaries were required to observe in order to have continued access to Saudi Arabian oil; (4) whether the consuming country governments monitored the offtakers' sales of Saudi crude oil into their countries to assure that such sales were not in excess of the prices established by Saudi Arabia, increased only by costs incurred in transporting the crude oil; (5) whether the Saudi Arabian pricing restrictions required petitioners and their offtakers to reflect the pricing restrictions in the transfer price on sales of Saudi *96 crude oil from petitioners' offtakers to unrelated entities which purchased the Saudi crude oil for refining; (6) whether in fact the crude oil pricing, restrictions imposed by Saudi Arabia was/were observed by petitioners and their offtakers; (7) if a crude oil pricing restrictions existed and petitioners and their offtakers observed the restrictions whether or not the pricing restrictions precludes or preclude a section 482 or section 61 adjustment to petitioners' income.
After trial of these issues, in the course of which the Court refrained from ruling on certain evidentiary issues, the parties were asked to file motions containing all their evidentiary objections. On June 11, 1991, respondent filed a Motion to Admit and Exclude Evidence and to Reopen the Record (Motion), [4] with a supporting memorandum. On the same date, petitioners filed a joint Motion to Strike (Motion to Strike), with a supporting memorandum. This opinion addresses the evidentiary issues raised in the parties' motions and their responses thereto. *97 Respondent's Motion
(1) Stipulated documents; hearsay objection reserved by respondent: Respondent's first category of objections is to several stipulated documents, to which hearsay objections were reserved by respondent in one of the stipulations. Under section 7453, we follow the Federal Rules of Evidence in proceedings before this Court. Hearsay is an out-of-Court statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Normally hearsay is excluded from evidence unless an exception to the hearsay rule applies. Snyder v. Commissioner, 93 T.C. 529, 532 (1989); Goldsmith v. Commissioner, 86 T.C. 1134, 1137 (1986). This rule of exclusion is designed to avoid the introduction of evidence that may have the appearance of trustworthiness, but is not subject to the test of cross-examination in the instant proceeding. Anderson v. United States, 417 U.S. 211, 220 (1974); Snyder v. Commissioner, supra at 533. Balanced against this rule is the countervailing policy that "'federal law favors the admission of probative evidence'". Petzoldt v. Commissioner, 92 T.C. 661, 679 (1989) *98 (quoting United States v. Holladay, 566 F.2d 1018, 1020 (5th Cir. 1978)). The documents in the first six categories of respondent's Motion appear to have serious hearsay problems. They consist of news publications, telegrams, congressional reports and transcripts, and a letter, all of which contain statements made by persons (sometimes unknown) who were not subject to cross-examination here and some of which do not appear to contain any inherent aspects of trustworthiness. The exhibits in these six categories were not argued by petitioners to be admissible substantively under an exception to the hearsay rule (or as not hearsay); they were only alleged to be admissible "to show the facts, data and other bases upon which the opinions and conclusions of the expert reports to which they are attached are based, as required by Tax Court Rule 143(f)". Because at least some of respondent's hearsay arguments appear to have merit, and petitioners found it unnecessary to address those arguments, we will receive the exhibits in five of these categories, the MEES and PIW excerpts (Exhibits 13, 15, 16, 18, 31, 40, 41, 43-45, 56, 120, 122, 132, 139, 142, 151, 154, 163, 165, *99 175, 176, 203, 208, 218, 232, 240, 242, 254, 257, 264, and 271), the State Department telegrams (Exhibits 50, 51, 52, 89, 90, 98, 105, 124, 126, 152, 228, 237, 243, and 267), the Congressional Subcommittee Reports and transcripts (Exhibits 17 and 158), the Glasmann letter (Exhibit 211), and the Exxon Background Series Paper (Exhibit 286) into evidence for the limited purpose under Rule 143(f) of showing the basis for the expert reports to which they are attached. To the extent that these documents (or identical copies thereof) are not attached to expert reports, they are excluded. In no event will those documents admitted be used as evidence of the truth of the matters asserted therein. Petitioners concede that Exhibits 93, 178, 215, and 248 relate to the expert witness reports of former Treasury Secretary W. Michael Blumenthal and former Assistant Treasury Secretary C. Fred Bergsten, which were not introduced into evidence. Accordingly, these exhibits will be excluded. (2) Documents on Scope of Restriction -- Admissibility Under Rule 146: (a) The last collection of documents in this subsection of respondent's Motion appears to be correspondence between the Saudi Arabian *100 Government (SAG) and petitioners concerning sales of full crude oil supplies by petitioners to developing countries at the SAG-imposed price. Exhibits 183, 185, 188, 195, 274, and 282. Respondent objects to the admission of these documents on two grounds, hearsay and under Rule 146. Because the Rule 146 issue is dispositive of these and certain other documents in this case (which we will discuss momentarily) even if they contain inadmissible hearsay, we will not address these hearsay objections. [5]
Rule 146 provides in pertinent part: "The Court, in determining foreign law, may consider any relevant *101 material or source, including testimony, whether or not submitted by a party or otherwise admissible." (Emphasis added.) On the basis of the authorities which have interpreted this Rule and its counterpart in rule 44.1 of the Federal Rules of Civil Procedure, as well as testimony in this proceeding and the parties' submissions on this issue, [6] we conclude that the documents at issue will be admitted under Rule 146. One argument presented by respondent against the admission of these documents is that they contain inadmissible hearsay. However, the scope of Rule 146 is extremely broad. As originally enacted, the Federal Rules counterpart of Rule 146, rule 44.1 of the Federal Rules of Civil Procedure, *102 stated in pertinent part that a court could consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43". (Emphasis added.) The 1975 amendment eliminated the reference to rule 43 and replaced it with a reference to the "Federal Rules of Evidence", thereby broadening its scope significantly. 5 Moore, Moore's Federal Practice, par. 44.1.01 [3-4], at 44.1-4 (2d ed. 1991) ("the purpose of the provision is to free the judge, in determining foreign law, from any restrictions imposed by evidence rules"); 9 Wright & Miller, Federal Practice & Procedure, sec. 2444, at 405-406 (1971) ("the trial judge's freedom of inquiry no longer is encumbered by * * * the rules of admissibility"). See United States v. First National Bank of Chicago, 699 F.2d 341, 343-344 (7th Cir. 1983) (district court properly admitted letters, affidavits and translations into evidence). The current version of Rule 146 does not contain a limiting reference to the Federal Rules of Evidence, and allows the admission of documents "whether or not * * * otherwise admissible". Respondent has cited no authority for the proposition *103 that Rule 146 is limited in scope to materials that do not contain hearsay. Accordingly, this objection to their admission has no merit. [7]
Respondent also argues that the language of Letter 103/Z (stipulated Exhibit 147) from the Saudi Petroleum Minister to petitioners, which constitutes the source of *104 the restriction as presented to this Court, is clear and unambiguous, not requiring any interpretation. Consequently, he argues, the documents at issue should not be admitted under Rule 146. This presumes language in Rule 146 that does not exist. There is no ambiguity requirement in that Rule, and we see no reason to limit the expansive scope of its language and that of its counterpart in the Federal Rules in order to read one in. Accordingly, this argument also is unpersuasive. Respondent next strenuously takes the position that the Saudi restriction in general was not a "law" for purposes of Rule 146. He contends that the Rule envisions formally promulgated "laws", such as statutes, regulations, and judicial precedents, and that petitioners have pointed to "no enabling legislation, no Saudi statute, and no regulation" referring to the restriction which the exhibits at issue are interpreting. Thus, he argues, because the source of the restriction did not rise to the level of such formal materials, the restriction at issue here was not a "law" within the meaning of the Rule, and the relaxed evidentiary standard of Rule 146 does not apply. Petitioners claim that respondent *105 is defining "law" for purposes of Rule 146 too narrowly. The testimony in this case about the manner in which "law" is promulgated in Saudi Arabia is a useful starting point in ascertaining the meaning of the word. In his expert witness report, [8] Mr. Abdulaziz H. Fahad, an experienced Saudi Arabian attorney, stated: In the Saudi system of government, there are very few formal written rules. There is no fundamental document that either defines the authority of the King or states the source of the King's sovereign power. There is no written constitution and no parliament. There is no reliance on the doctrine of stare decisis because each judicial decision must independently rely on the authority of the Shariah [Islamic law] and, when applicable, recent legislation. Thus, informality and lack of formal written rules characterize the whole Saudi legal and political system.
At trial Mr. Fahad testified that, while there exists in Saudi Arabia a formalized regulatory process, there also is a large element of informality. He indicated in his report that one method commonly used by the Saudi government to communicate its position on certain matters (particularly those *106 affecting a small number of persons or entities) is "by letter, cable, or telex to the particular persons or entities affected". He further clearly stated at trial his opinion that the letters giving rise to the restriction are the law of Saudi Arabia. *107 Respondent's expert on the subject of Saudi law, Ali H. Almihdar, [9] indicated his opinion that the letters were not "law" in any accepted sense, and that petitioners could have chosen to make a legal challenge (which would have been successful, he believes) to the restriction. In his view, the basis for that legal challenge would have been that the relationship between the SAG and the Aramco [10] offtakers was governed by the terms of an informal agreement in effect during the years at issue, and under the terms of that agreement the Saudis "had no legal right to interfere in the terms and conditions by which the offtakers resold or transferred crude oil to affiliates". He further indicates that, contrary to petitioners' assertions, the making of "enforceable laws" in Saudi Arabia is "not arbitrary, capricious, ad hoc, or mysterious". Rather, there are many similarities to Western legal systems, with a Council of Ministers, resolutions, legislation, and regulations, all of which evidence the formal legal processes in that country. *108 Mr. Almihdar's conclusion that the Saudi directive did not constitute "law" is flawed in several material respects. First, he overlooks the distinctive aspect of Saudi Arabian governmental structure that, with all its formalities of regulatory process, it is nonetheless a monarchy. Whether the directive was issued with the King's authority is one of the many questions on the validity of the restriction that remain to be briefed by the parties in their briefs on the merits, but this feature (which was almost ignored in his report) certainly undermines Mr. Almihdar's description of the Saudi legal process as rigidly adhering to traditional formal legal process. Second, the fact that the directive could have been but was not challenged by petitioners does not indicate that the directive was not "law" for our purposes. Government actions that are capable of being argued as improper may still constitute "law". Moreover, it is unclear that such a challenge would have been successful, given the political climate at the time. There was testimony that such an appeal would have subjected petitioners to considerable economic risk. See Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 337 (1990). *109 Lastly, it seems that Mr. Almihdar was overemphasizing semantics. He admitted on cross-examination that the Aramco shareholders were required to follow the restriction, yet he refused to call it "law". Accordingly, the testimony in this case leads us to conclude that, for the limited purpose of whether we should admit materials interpreting the restriction under Rule 146, the restriction constituted "law". Tax Court precedent supports this conclusion. In our opinion in Procter & Gamble Co. v. Commissioner, supra at 336-337, we admitted certain documents under Rule 146. On the merits of that case, the taxpayer argued that Spanish law prohibited certain royalty payments, and therefore it did not improperly use its control to shift income. Thus it was argued that section 482 did not apply. The Commissioner argued that Spanish "law" did not prohibit the royalty payments at issue. We were not persuaded by the Commissioner's argument that, because the prohibition was expressed in a series of letters from the Spanish Government, it was merely an administrative exercise of discretion, not "law". We concluded that "Spanish law" was involved. Of "paramount *110 importance" to this finding were the expressions of the prohibitions contained in approval letters issued by the Spanish Government. We stated that "it is clear that in order to do business in Spain, petitioner had to play by Spain's rules". Procter & Gamble Co. v. Commissioner, supra at 336. We further noted that other comparable companies were similarly prohibited from paying such royalties, so that it was consistently applied. In connection with the definition of "law" we expressly observed: In light of the consistency with which the royalty prohibition was applied, there is no need to identify a specific constitutional or statutory provision codifying the prohibition in order to treat the prohibition as law. See U.S. Padding Corp. v. Commissioner, 88 T.C. 177, 187-188 (1987), affd. 865 F.2d 750 (6th Cir. 1989) (under analogous circumstances this Court interpreted the term "laws of such country" under section 1504(d) to include not only explicit constitutional or statutory provisions and explicit rules and regulations by controlling authority, but also any existing practice or policy of such foreign country). *111 * * * [Procter & Gamble Co. v. Commissioner, supra at 337.]
At the heart of our finding that the requisite "law" was present was consistent application. Respondent here has not taken the position that the restriction was not applied to the other Aramco companies in the same manner as it was applied to petitioners; thus, there appears to be no dispute that the restriction at issue here was applied consistently. Respondent attempts to distinguish Procter & Gamble because, he argues, in that case "the Court interpreted what was stipulated to be a series of statutes and regulations applied by the Spanish government to the taxpayers' Spanish subsidiary". In Procter & Gamble, the restriction was issued somewhat informally, but there also existed certain formally codified laws, to which the parties had stipulated. The lack of formally codified enabling legislation in Saudi Arabia, however, was not unusual, according to Mr. Fahad's testimony. Therefore, this distinction is not critical. Moreover, the above-quoted language from Procter & Gamble makes it clear that even law expressed in informal form is sufficient to constitute "law", without requirement *112 of formal codification. Accordingly, we hold that the restriction constitutes "law" for purposes of Rule 146. [11]
Respondent further alleges that these documents "do not assist the Court in its determination of Saudi law because they are silent regarding Saudi law". We do not see any reason to limit the scope of our analysis of Rule 146 to only those documents which contain an express reference to the "law" being explained. There is no question that these documents were intended to explain the SAG understanding of the scope of the restriction. It is sufficient that, based upon the context, the law to which the documents refer is clear. The documents at issue here involve communications between petitioners and the SAG concerning sales of oil subject to the restriction. They thus will be helpful to the Court in understanding the *113 scope of the restriction. Accordingly, we hold that these documents are admissible under Rule 146 to help us in our determination of Saudi law. We of course do not decide at this time whether the restriction was a valid "law" for purposes of these motions; we only decide here that evidence concerning the restriction may be received into evidence as "relevant material" "in determining foreign law" under Rule 146. They are therefore properly received in evidence. [12]
*114 (b) Two other sets of documents at issue, which we now address under Rule 146, were prepared on two separate occasions in 1990 and 1991 by the SAG's Minister of Petroleum and Mineral Resources, Mr. Hisham M. Nazer, purportedly interpreting the scope of the restriction. With regard to both sets of these documents, respondent renews his hearsay objections to their admission, since the Minister was not subject to cross- examination in this proceeding. He also raises questions concerning their authenticity. If admitted and found by the Court to be reliable, these materials clearly will be useful in interpreting the scope of the restriction. For the same reasons as we have indicated above, these documents will be admitted under Rule 146, which is not subject to the traditional rules of admissibility. We will discuss each set separately, as respondent's objections were made in separate documents. Respondent objects to the first set of documents in his Motion. These documents consist of a letter (and translation thereof) from Mr. Nazer (first Nazer letter), which indicates that the restriction applied to all sales of Saudi oil, whether sold to related parties or otherwise. It also *115 contains a reference to other details concerning the scope of the restriction. Exhibits 2004 (attachment 22), 2005, and 2006. The original letter in Arabic was received by petitioners. According to Mr. Fahad's testimony, at petitioners' request Mr. Fahad presented the original signed Arabic letter to the Saudi Petroleum Ministry to obtain an official translation. Mr. Fahad indicated that it was the customary practice of the Ministry when a document was officially translated to attach to the translation a copy of the letter being translated with a stamped signature, and such a document was attached to the translation provided to Mr. Fahad. The translation was certified to be an official translation by the Deputy Minister for Finance and Administrative Affairs. Mr. Fahad's testimony indicates that he then took the translation to the Ministry of Foreign Affairs to authenticate the signature of the Deputy Minister, and a stamp in the lower left-hand corner of the translation reflects that authentication. Mr. Fahad then obtained a document from the United States Consul in Riyadh authenticating the signature and seal of the Ministry of Foreign Affairs. The four documents -- the *116 hand-signed letter in Arabic, the official translation, the stamp-signed letter in Arabic attached to the translation, and the United State Consul authentication -- are being offered into evidence by petitioners as Exhibits 2005 and 2006 and as attachments to Mr. Fahad's expert report. Respondent's first contention with regard to these documents is that they were not properly authenticated because "petitioners have not shown that the translation offered in evidence was a Ministry file copy of a letter written and signed by Nazer". He does not dispute the accuracy of the translation, but asserts that "The crucial certification -- that the unsigned Arabic letter is an official record from the Ministry files -- is missing." Petitioners contend that the English translation was self-authenticated under rule 902(3) of the Federal Rules of Evidence and that the Arabic versions of the letter were properly authenticated under the general authentication requirements of rule 901, Federal Rules of Evidence.
Although below we also will admit these exhibits under Rule 146, which we have indicated allows into evidence documents that might otherwise not be admissible, because of the parties' extensive *117 discussions on the authenticity of these materials, we believe it appropriate to explain why these materials are sufficiently authentic to be admitted. We agree with petitioners that the documents at issue here were properly authenticated under rules 901 and 902(3) of the Federal Rules of Evidence.Rule 901 of the Federal Rules of Evidence provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims". One of respondent's complaints is that the translation lacks the crucial certification that the stamp-signed Arabic letter attached to the translation is an official record from the Ministry's files. The letter that was presented for translation, however, was not the stamp-signed letter but the hand-signed original one. Other than the signatures, the two letters are identical. Therefore, we do not agree with respondent that such certification was required. A second argument by respondent is that there are no certifications of the authenticity of Minister Nazer's signature. However, the letters when read together indicate *118 that the signature on the hand-signed original Arabic version was Minister Nazer's. The stamped signature of the stamp-signed Arabic copy (attached to the translation) indicates that it is, according to Mr. Fahad's undisputed testimony, "a copy identical with the original". The translation certifies and attests that it is an "official English translation to the letter No. 71/H, dated 18 Muharram 1411 of H. E. The Minister of Petroleum and Mineral Resources to Mr. Jack Clarke, Vice President, Exxon". Such statements necessarily imply that the persons involved in translating the document satisfied themselves that the signature was genuine, or they would not have been willing to describe the letter being translated as being a letter "of" the Minister of Petroleum. We so indicated at trial. The authenticity of Minister Nazer's signature also was affirmed by the second Nazer letter, which we admit below, and which contains a direct reference to the first Nazer letter, affirming its contents. Furthermore, the requirements of self-authentication of rule 902(3) of the Federal Rules of Evidence have been met by the sequence of steps followed here. See 2 Saltzburg & Martin, Federal Rules *119 of Evidence Manual, at 508 (1990). Lastly, if respondent had any true remaining doubts about the authenticity of this letter, he should have cooperated with petitioners when they offered him the opportunity to verify its authenticity in their letter of August 29, 1991, to respondent (see Attachment A to Exhibit 1 of Petitioners' Response to the Court's September 27, 1991, Order and Respondent's Response Regarding the Admissibility of Minister Nazer's Letter Dated July 13, 1991 (Petitioners' October 16, 1991 Response)). Respondent waived his authenticity objection by his refusal in his letter to Mr. Moore on September 4, 1991 (see Exhibit 2 to Petitioners' October 16, 1991 Response), to cooperate with petitioners. Accordingly, we find that the first Nazer letter, both in its Arabic and translated form, was properly authenticated. Respondent urges us not to accept the first Nazer letter into evidence under Rule 146 on numerous legal grounds, most of which we ruled upon earlier in this opinion. However, he also contends that it should not be admitted under Rule 146 because it does not assist in determining whether Letter 103/Z is "law". As we have discussed earlier, the restriction *120 as expressed in that letter constitutes law for purposes of Rule 146, and we need not repeat that discussion here. But respondent's argument that we may only use the document if it assists us in determining whether the Letter 103/Z is law also is overly restrictive. Rule 146 allows us to consider "any relevant material" "in determining foreign law". Respondent admits in his memorandum that the contents of the first Nazer letter (a copy of which was attached to Mr. Fahad's report) "bear directly" on "the status of Letter 103/Z and its intended scope". This language makes it clear that the first Nazer letter comes within the Rule 146 standard. Respondent's limitation has no basis in the Rule or in any other material cited. Accordingly, we find it to be unpersuasive. Respondent next contends that admission of the first Nazer letter under Rule 146 should not be allowed because it would subvert the requirements of our expert witness rules by allowing the admission of a conclusion on ultimate facts without the safeguards of testing the expert's qualifications, inquiring into the underlying facts or data, and cross-examination. Admitting that "Rule 146 dispenses with the safeguards *121 built into the rules on experts", respondent urges us to closely examine the conclusions made therein. While we agree that it is perfectly appropriate to examine the inherent trustworthiness of any document received into evidence, we do not agree that Minister Nazer's letter constitutes an expert witness report in this proceeding. It contains statements of facts, not conclusions requiring the analysis of an expert. It apparently contains a recitation of Mr. Nazer's understanding of the application of the Saudi restriction. While the basis for this understanding was not evident to the Court at trial, petitioners attempted to address the Court's concern about this in the second Nazer letter, discussed below. Accordingly, we hold that our expert witness rules do not preclude receipt of this letter under Rule 146. Respondent next argues that Attachment 22 to Mr. Fahad's expert witness report (Exhibit 2004), which contains another copy of the first Nazer letter, should not be admitted under Rule 143(f) as showing the basis for his opinion because it would be highly prejudicial and therefore subject to exclusion under rule 403 of the Federal Rules of Evidence. However, rule 403 of *122 the Federal Rules of Evidence refers to exclusion because of "unfair" prejudice. Respondent has not demonstrated that this letter qualifies as being within that standard. Evidence which is harmful to respondent's position does not necessarily qualify as "unfair". An additional argument made by respondent against admission of the first Nazer letter is that it was prepared for litigation, which, he argues, is in itself reason not to admit it. He cites United States v. The First National Bank of Chicago, 699 F.2d 341 (7th Cir. 1983), in support thereof. In that case one of many factors in support of the Court's finding that an attorney's letters were probative evidence was that they were written before the information contained therein had been brought in issue in that or any other litigation. Id. at 345. This presumably was observed to show that the letters were unbiased. In other cases, however, courts have examined documents prepared in connection with litigation in making factual determinations. See Twohy v. First National Bank of Chicago, 758 F.2d 1185, 1192 (7th Cir. 1985); A/S Kreditt-Finans v. Cia Venetico de Navegacion, 560 F. Supp. 705, 709 (E.D. Pa. 1983), *123 affd. without published opinion 729 F.2d 1446 (3d Cir. 1984). Experience teaches that awareness of imminent or pending litigation tends to impress upon the preparer of a document the importance of telling the truth and therefore may make that document particularly reliable. [13] We find this to be so when the document is from an unrelated party, as is the case with the first Nazer letter. We are aware of no evidence in the record upon which we can conclude that Mr. Nazer's letter is biased or in some other way inherently so unreliable as to require its exclusion. We conclude that the first Nazer letter will be helpful to the Court in its determination of foreign law in this case. Accordingly, because *124 respondent's arguments against its admission do not persuade us otherwise, it is admitted under Rule 146. Respondent also contends that, even if the first Nazer letter is admitted under Rule 146, it should be accorded little or no weight. In Chadwick v. Arabian American Oil Co., 656 F. Supp. 857 (D. Del. 1987), a case cited by respondent to support his objection to these documents, the District Court received into evidence under rule 44.1 of the Federal Rules of Civil Procedure an affidavit submitted by plaintiff. In connection therewith, the court stated that, "Although a court may consider any materials presented on foreign law, the trial judge is free 'to give them whatever probative value he thinks they deserve.'" Chadwick v. Arabian American Oil Co., supra at 861 (quoting 9 Wright & Miller, Federal Practice and Procedure, sec. 2444, at 406 (1971)). The court discussed the probative value of the affidavit there at issue. Chadwick v. Arabian American Oil Co., supra at 861. We already have held that the first Nazer letter is admitted under Rule 146. Discussion of the weight we will give to that letter or *125 any other evidence is premature at this time. We will take respondent's argument under advisement and, in our next opinion, we will discuss the probative value of the admitted evidence to the issues we are trying. See supra note 12. The second set of documents from Mr. Nazer objected to by respondent concerns another letter from Minister Nazer (second Nazer letter), [14] which petitioners obtained in response to a comment by the Court during trial. We stated that we felt the first Nazer letter did not adequately show that Minister Nazer had examined Saudi records and was convinced on the basis of those records that the statements contained in the first Nazer letter were correct. After the end of the trial, petitioners submitted an affidavit from Mr. Fahad and the second Nazer letter, attempting to alleviate the Court's concerns. Submission Regarding the Court's Request to Confirm Minister Nazer's Letter of August 8, 1990 (and attachments thereto). Respondent objected to receipt of the second Nazer letter on various grounds. *126 In addition to his arguments on the scope of Rule 146, which we have already addressed, respondent contends that the second Nazer letter should not be admitted because he was not accorded adequate access to Minister Nazer in order to ascertain the truthfulness of the statements made in his letters. In this regard, he notes that the Court at trial had suggested that petitioners go with a representative of respondent back to Minister Nazer to verify the contents of the first Nazer letter, and that petitioners proceeded to obtain this verification without a representative of respondent being present. The Court was concerned when informed by respondent of this and, on September 27, 1991, we issued an order requiring that petitioners arrange for respondent to have an opportunity to verify the contents of the second Nazer letter or face the prospect of its exclusion. On October 15, 1991, respondent filed a response to the Court's Order, indicating that the only satisfactory method of verifying either Nazer letter was by means of live cross-examination or live deposition and production of the documents relied on by Minister Nazer in reaching his conclusions in those letters. On October *127 16, 1991, we received a response from petitioners which indicated that, on August 29, 1991, petitioners had offered to have their expert Mr. Fahad accompany a representative of respondent to the Saudi Ministry to verify the authenticity of the Nazer letters by introducing respondent's representative to the same Ministry personnel with whom Mr. Fahad had dealt. Respondent declined to engage in such a procedure, asserting in a letter to petitioners' counsel that "authenticity is but one of the problems of the subject documents. * * * We do not see how a trip to Saudi Arabia solely to establish authenticity would resolve any fact which could be stipulated or lead to any evidence admissible in this litigation." He went on to state that "it would be impossible to commit to make a trip to Saudi Arabia without prior planning", and therefore the offer was declined. We view this as an overt refusal on respondent's part to act in good faith to rectify his concerns about either the first or second Nazer letter. In keeping with our Order of September 27, 1991, petitioners offered to provide respondent's representative with the same "access" to Minister Nazer as Mr. Fahad had received. We *128 understand that respondent did not wish only to verify the authenticity of the Nazer letters, but wanted to cross-examine Minister Nazer in person about the contents of both letters. This option does not appear to have been available, even to Mr. Fahad. Respondent could (and should) have participated in the options available and only if they proved to be unsatisfactory asked the Court for further rulings. He chose instead to insist upon a live interview with Minister Nazer or participate in nothing at all. He will have to live with the latter. That respondent chose not to take advantage of this opportunity should not penalize petitioners by the exclusion of the Nazer letters. Accordingly, we find that the "access" referred to in our Order of September 27, 1991, was provided. [15]
*129 We also do not see any apparent reason to suspect the veracity of the second Nazer letter. While respondent has tried to raise some suspicion of collusion between the Saudi Government and petitioners, the attachment to his memorandum in Support of Notice of Objection, filed August 22, 1991, of newspaper articles concerning business deals between the Saudis and certain oil companies is hardly the sort of evidence upon which we are willing to make a finding of collusion. We find evidence of collusion to be completely lacking in the record. We also note that respondent's assertions that the second Nazer letter is ambiguous because of its lack of reference to time is without merit. Whether Minister Nazer's understanding of the facts was obtained on the basis of information received in 1979 or 1991 is not critical; it is sufficient that his understanding was obtained as a result of his "knowledge of the policy of the Government of the Kingdom of Saudi Arabia in [his] capacity as a member of the Council of Ministers and after conducting a thorough examination of the Ministry of Petroleum & Mineral Resources documents during the relevant periods", as stated in the second Nazer letter. *130 Finally, respondent contends that the record was held open only to receive certain other materials not at issue here, and that petitioners' attempt to introduce the second Nazer letter was not contemplated by the Court or the parties. While it is true that at the close of trial there was no reference to the submission of this document, this does not preclude its submission when the Court earlier had requested it. We believe that failure to reference it at the end of trial was quite likely due to the massive size of the record and the fact that at that particular moment the parties simply had neglected to mention it. Since we requested the parties to obtain this additional information, and respondent was given an opportunity to verify it, the Court's request for additional information was appropriately addressed by petitioners after the end of the testimony. We conclude that the second Nazer letter will assist us in our determination of Saudi law. Therefore, it is admitted under Rule 146. (3) Testimony of Mr. Clifton C. Garvin, Jr.: Tr. 113-114. At trial, Mr. Garvin, formerly Exxon's Chairman and Chief Executive Officer, testified to a telephone conversation in which he *131 participated with Minister Ahmed Zaki Yamani, then Minister of Petroleum and Mineral Resources of the SAG, concerning the scope of the restriction. The testimony indicates that Mr. Yamani said the restriction applied to all oil that Exxon purchased from the Saudis, regardless of its disposition. This is different from the language of Letter 103/Z, which indicates that the restriction applied to sales to "third parties". Respondent objected at trial, and renews his objection in the instant motion, to this testimony on hearsay grounds because Mr. Yamani did not appear in court for cross-examination. The Court ruled then that testimony concerning this conversation was not hearsay because Mr. Garvin was describing the conversation not for the truth of its content but for confirmation of what he was told to do by the SAG. We confirm that ruling now. The conversation is admissible not to prove that the restriction applied to all Saudi oil, but to prove that Exxon's understanding that it applied across-the-board was reasonable, to the extent that such understanding is relevant and material to the issues herein. We also note that this testimony is admissible under Rule 146 in ascertaining *132 the scope of the Saudi restriction, for which its contents may be used in support of the truth thereof. We express no opinion as to the probative value of Mr. Garvin's testimony on this issue, which must be carefully explained by the parties in their briefs on the merits. (4) Foreign Depositions: The Court received into evidence, subject to respondent's objections, five foreign depositions, which had been taken prior to trial on written questions [16] pursuant to the Court's Orders. (a) Giuseppe Ammassari: Exhibit 2012. [17] Respondent contends that the fact that Mr. Ammassari felt compelled to submit a written response to cross-question 20 casts doubt on whether he was testifying from personal knowledge. Petitioners assert that Mr. Ammassari's use of an exhibit in response to a detailed question on price control laws was not precluded by rule *133 612 of the Federal Rules of Evidence when used to refresh his memory. Mr. Ammassari's written answer contains several detailed explanations and references to legal materials that would not in all likelihood have been in his memory without reference to notes if he had been testifying at trial. Rule 612 of the Federal Rules of Evidence permits a witness to refresh his memory by referring to a writing so long as that writing is produced at the hearing and the witness is subject to cross-examination in connection with it. Our Rule 84(c), concerning depositions upon written questions, provides: "The parties and their counsel may attend the taking of the deposition but shall not participate in the deposition proceeding in any manner." Because he could not "participate", respondent could not have cross-examined Mr. Ammassari with respect to the prepared statement by means of modified questions at the time of the deposition. However, Rule 85(d) provides for objections as to manner and form of the deposition, and states: Errors or irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, * * * and errors *134 of any kind which might have been obviated, removed, or cured if promptly presented, are waived unless reasonable objection thereto is made at the taking of the deposition. [Emphasis added.]
Respondent did not object at the time of the deposition to Mr. Ammassari's prepared statement, and an objection at the time might have prevented Mr. Ammassari's reading of the prepared material. Therefore the objection has been waived. Accordingly, use of the prepared statement to answer cross-question 20 was acceptable. Respondent also seeks to exclude a portion of Mr. Ammassari's deposition that he claims is "speculating about the subjective intent of the Saudis", which was beyond his personal knowledge, and which "of necessity is based on other unidentified out of court statements". Petitioners claim that the requisite personal knowledge was present and that these "high ranking *135 energy officials should be permitted to state their understanding of Saudi oil policies based on their own personal knowledge and experience". We agree with petitioners. Mr. Ammassari was Director General for Energy Resources at the Italian Ministry of Industry during the years at issue and thus was qualified to testify about what the Italian Government was "aware" of and what instructions it received in connection with Saudi oil. The question does not appear to be designed to elicit proof of the Saudi restriction; rather, it appears to elicit evidence concerning the reaction of the Italian Government to that restriction. Moreover, both questions at issue were prefaced by the words "To your knowledge". The only response to a question containing such language presupposes such knowledge. Accordingly, the entire Ammassari deposition is admitted. (b) Jean-Pierre Capron: Exhibits 2013, 2013A. Although respondent's Motion seeks to exclude Mr. Capron's deposition, he does not explain in his memorandum in support thereof on what grounds it is offensive. At trial, respondent indicated some concern about Mr. Capron's use of a written response, but we assume from his failure to *136 mention such a writing (if one existed) that he has waived his objection. [18] Accordingly, Mr. Capron's entire deposition is admitted. (c) David Howell: Exhibit 2014. Respondent's first objection to Mr. Howell's deposition is that he read a prepared answer in response to respondent's cross-question concerning the operations of his staff, thereby tainting the entire deposition. The 13-line statement by Mr. Howell is sufficiently detailed that reference to written material does not seem unreasonable. It certainly does not, as respondent contends, "cast doubt" on Mr. Howell's personal knowledge in his entire testimony, nor does it "taint" his deposition in its entirety. The second objection by respondent is that a portion of Mr. Howell's testimony appears not to be based on personal knowledge but to be sheer speculation as to the Saudi reasons for the restriction *137 and the consequences of sales by the Aramco shareholders of Saudi crude at prices in excess of the Saudi official selling price (OSP). In that this testimony talks about Saudi intent, we agree with respondent that this material is on its face speculative, and we do not intend to rely upon it as a basis for our findings of fact. However, insofar as it reflects upon why his government behaved the way it did and potential options available to deter violation of the restriction, it is based upon the personal understanding of the Secretary of State for Energy of the United Kingdom concerning that country's options. Therefore it is based on personal knowledge. We also note that any harm alleged to have occurred from the testimony giving rise to respondent's objections was capable of being removed by our receipt into evidence of one of Mr. Paul Stevens' expert witness reports, and testimony in connection therewith, presented by respondent in rebuttal to Mr. Howell's deposition. See Exhibit BBT, Tr. 2145. Accordingly, that deposition in its entirety is admitted. (d) Helmut Schmidt: Exhibit 2015. Former German Chancellor Schmidt at the beginning of his testimony stated as follows: *138 My review [of the questions posed by the parties] shows that many of the questions are hypothetical, many of them are repetitive and many of them deal with details that go beyond my knowledge and remembrance. In order to make an understandable and coherent response, I will not address each question separately. Rather, in the statement which follows, I will give all of my answers which, I believe, address the essence of the questions posed.
Respondent states that former Chancellor Schmidt's statement on its face is not based upon personal knowledge, and that he in his prepared statement "did not answer any of the questions posed". Therefore, respondent argues, the former Chancellor's testimony was not subject to cross-examination and should not be admitted. Petitioners state that there is "procedural latitude" under Rule 81(e)(2) pertaining to foreign depositions and that we should exercise our discretion here to admit the statement by granting the parties that latitude, particularly in view of the deponent's reputation. They also indicate that the objective of rule 28(b) of the Federal Rules of Civil Procedure (which was amended in 1963 to add the statement that evidence *139 need not be excluded merely because of certain departures from our deposition rules) is stated in the Advisory Committee's Notes to rule 28 to allow a foreign deposition into evidence unless it is "so devoid of substance or probative value as to warrant its exclusion altogether". [19] Further, petitioners assert that former Chancellor Schmidt's response provided answers to the written questions posed, and that he merely declined to answer those questions that were beyond his remembrance. *140 We do not believe that former Chancellor Schmidt's statement can be said to qualify as a foreign deposition within the meaning of rule 28(b) of the Federal Rules of Civil Procedure. We have reviewed that statement in conjunction with respondent's cross-questions and have determined that many of those questions were largely unanswered. While petitioners claim that those questions which were not answered were not capable of being answered from his personal knowledge, this does not appear to be so, since some of the questions -- such as those related to whether he was in the employ or on the payroll of petitioners -- clearly were. Therefore, former Chancellor Schmidt's prepared statement will be viewed by us as a sworn statement that was not subject to cross-examination in this proceeding, and thus hearsay. Petitioners make a persuasive argument that, even if the statement constitutes hearsay, it should be admitted into evidence under the "catch-all" exceptions in rule 804(b)(5), Federal Rules of Evidence, when the declarant is unavailable. That rule provides: (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: *141 * * * (5) Other exception. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. * * *
The legislative history of this exception indicates that it is to be used "very rarely, and only in exceptional circumstances". S. Rep. 93-1277, at 19-20 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7066. Robinson v. Shapiro, 646 F.2d 734, 742 (2d Cir. 1981). Courts have admitted hearsay statements under this rule because their probative value is high as a result of the demonstration of certain indicia of reliability or trustworthiness within the spirit of the rule 804, Federal Rules of Evidence, class of exceptions. 4 Weinstein & Berger, Weinstein's Evidence, par. 804(b)(5 [01] at 804-173 (1975). *142 The trial court has a considerable measure of discretion in applying this exception. Nowell v. Universal Electric Co., 792 F.2d 1310, 1315 (5th Cir. 1986); Huff v. White Motor Corp., 609 F.2d 286, 291 (7th Cir. 1979). Accordingly, we must examine carefully whether each of the requirements of that rule have been met and whether the requisite reliability is present. The first requirement of unavailability needs little discussion. Petitioners have indicated that former Chancellor Schmidt was unavailable for trial, and he is beyond the subpoena power of the Court. Accordingly, the threshold of rule 804(b)(5), Federal Rules of Evidence, has been met. The second requirement of trustworthiness could hardly be better met than here, where a former head of state describes his recollections pertaining to his government's perspective during the period at issue on some of the issues we are trying. See Furtado v. Bishop, 604 F.2d 80, 91 (1st Cir. 1979) (prominent attorney's affidavit possessed requisite trustworthiness). We see no evidence of, or reason for, fabrication here. See Robinson v. Shapiro, supra at 743. *143 That former Chancellor Schmidt's statement was based upon his personal knowledge further buttresses its reliability. See United States v. Carlson, 547 F.2d 1346, 1354 (8th Cir. 1976). On cross-examination, Dr. Klaus Marquardt, a witness presented by respondent in rebuttal to the former Chancellor's statement, indicated that the former Chancellor "was a very well esteemed man internationally". If respondent's own witness so testifies, we think it beyond dispute that former Chancellor Schmidt's testimony is inherently reliable and trustworthy. The third requirement of materiality likewise has been met. One of the issues in this proceeding is "whether the consuming country governments monitored the offtakers' sales of Saudi crude oil into their countries to assure that such sales were not in excess of the prices established by Saudi Arabia". Monitoring and his country's ability to enforce the restriction constitute a substantial part of the former Chancellor's statement. We find therefore that it is material. The fourth requirement, that the statement be more probative on the point than any other evidence that might be reasonably obtained, also is met here. *144 Former Chancellor Schmidt's statement contains certain assertions of external fact about the Saudi restriction, which might be -- and were -- contained in other evidence. However, it also contains many statements of his perceptions of those external facts and his reactions to them. It also describes those steps which he would have taken as Chancellor of Germany if the Saudi restriction had been violated. Much of this is evidence that not only could not have been obtained more directly from another source, but in fact it probably could not have been obtained from any other person at all. Therefore, it is clearly more probative than any other evidence that could have been obtained. Lastly, we find that the interests of justice will be served by admission of this statement into evidence. Respondent was given ample notice of this deposition and its offer into evidence and had ample opportunity to counter it with evidence to the contrary. Respondent took advantage of this opportunity by presenting Dr. Marquardt's expert witness report (Exhibit BCK) and his testimony in connection therewith in rebuttal to former Chancellor Schmidt's statement, and the Court received that report *145 into evidence without objection by petitioners. [20]
Accordingly, former Chancellor Schmidt's statement will be received into evidence. (e) A. A. Theo Van Rhijn: Exhibit 2016. Respondent objects to Mr. Van Rhijn's entire deposition because it indicates that he consulted with a former assistant in preparing his testimony and therefore was not testifying on the basis of personal knowledge. He also objects to receipt in evidence of an exhibit to the deposition consisting of a statement that had been prepared by Mr. Van Rhijn at petitioners' request in August 1990, on the ground that the exhibit is inadmissible hearsay; he additionally claims that receipt of the exhibit would violate Rule 143(b), which provides that ex parte affidavits are not evidence. Petitioners *146 claim that consultation with an assistant was entirely proper and that respondent's objection to Mr. Van Rhijn's exhibit was waived by his failure to object at the time of the deposition. That Mr. Van Rhijn consulted with an assistant in order to prepare for his deposition is hardly surprising or inappropriate, given his testimony that he had not been involved with the relevant subject matter since 1980. Indeed, had he not engaged in such consultations, we would have found his memory of the facts to be somewhat questionable without a review of pertinent materials. The deposition further indicates that Mr. Van Rhijn had substantial involvement in the energy policies of the Netherlands during the years at issue. Therefore, respondent's objection to admission of the deposition because of lack of personal knowledge has no merit. With regard to respondent's objection to Exhibit 2 attached to Mr. Van Rhijn's deposition, we conclude that the exhibit should be admitted. As indicated earlier, under Rule 84(a), respondent could not have modified his prepared questions to Mr. Van Rhijn to tailor them to the content of the exhibit that was received during the deposition. If, however, respondent's *147 representative had made an objection to this exhibit during the deposition, Mr. Van Rhijn and petitioners' representative would have been on notice that the content of the exhibit might not be accepted by the Court, and Mr. Van Rhijn probably would have been instructed to answer the questions in more detail verbally. Because this was the kind of objection referred to in Rule 85(d), respondent's failure to object at the time of the deposition constitutes a waiver. Nor can this exhibit be considered an impermissible "ex parte affidavit" within the meaning of Rule 143(b). Mr. Van Rhijn's former statement was endorsed by him during the deposition and was simply being referred to in order to avoid repetition of the statements made therein. Respondent also had plenty of time to ask the Court for an opportunity to depose Mr. Van Rhijn again under a set of cross-questions designed with the exhibit in mind to bring out any inconsistencies or misstatements of fact. He also had ample opportunity to introduce contrary evidence into the record. We conclude from respondent's failure to do either that he does not feel it is necessary to do so. In that regard, we reiterate that the exhibit *148 apparently merely elaborates in more detail upon Mr. Van Rhijn's oral statements, and does not particularly add any material that enhances petitioners' position. Therefore, respondent's objections to the deposition and Exhibit 2 to that deposition are overruled. [21]
(5) Appendices to Expert Witness Reports and Citations from Such Appendices in the Body of the Reports: Cooper Report, Exhibit 2002, Apps. 2-52; Ikuta/Tanaka Report, Exhibit 2011, Apps. C-J; Venrick Report, Exhibit 2000, Apps. 1-8 and Apps. labeled PIW, MEES,and P.E.; Schlesinger Report, Exhibit 2001, Apps. 3 and 5; Fahad Report Exhibit 2004, Atts. *149 11-18, 20-25, and 27; and Seymour Report, Exhibit 2007, Atts. 1(B)-9 and 12-25. Respondent claims that certain appendices and attachments to petitioners' expert witness reports, while admissible under Rule 143(f) and rule 703, Federal Rules of Evidence, as providing the bases for the experts' opinions, may not be used as proof of the matters asserted therein because they contain hearsay. Petitioners appear to agree. Therefore, all of the above appendices and attachments -- as well as references to them in the body of the reports -- will be admitted into evidence for the limited purpose of providing the bases for expert witness reports as required under Rule 143(f). However, petitioners additionally assert that certain of the appendices to Richard N. Cooper's report (Exhibit 2002) "contain documents stipulated by the parties for all purposes without hearsay objections". They do not cite to the stipulations where those documents may be found, and we do not intend to comb through this record to look for them. We hold, however, that, where there is a stipulated document in the record to which the parties have not reserved any objections, all objections to their admissibility will *150 be overruled. Accordingly, if petitioners are correct that they have been independently stipulated without reserved objection, the documents referred to by petitioners will be admitted for all purposes, so long as, when they wish to rely upon them for findings of fact, they indicate in their proposed findings what the stipulated document numbers are. (6) Expert witness reports: (a) James R. Schlesinger: Exhibit 2001. In the course of respondent's cross-examination of Dr. Schlesinger, the Court indicated its belief that his expert report was not limited to material facts or to the issues before the Court. We expressed concern that the issues as framed in the Court's Scope of Trial Order had not been the issues addressed in the report, which contained much unnecessary "background" material that did not pertain to whether or not there was a restriction and whether or not the parties were required to comply with it. While the report provides a very interesting summary of Saudi-United States relations, we note that it is not until page 14 of Dr. Schlesinger's 21-page report that the restriction at issue is even mentioned. We indicated at trial that knowledge of the restriction *151 was relevant, but that the general discussion of government policy was unnecessary to decide the issues being tried. After 100 pages of cross-examination, we indicated that respondent had gone far beyond Dr. Schlesinger's knowledge about the "wide understanding of the existence of the restriction" and that the report had gone far beyond that scope as well. We also indicated that we would not pay any attention to unnecessary material and that if the Court later changed its mind about what was then deemed to be totally irrelevant material we would resume the trial and bring Dr. Schlesinger back on the stand. Respondent then stated that he would outline the areas he was going to cover from the report on cross-examination, to which the Court again assured respondent that he would have an opportunity to recall Dr. Schlesinger if we decided to go beyond the scope of the Court's position later during the trial. Respondent then decided to end his cross-examination of Dr. Schlesinger. Respondent now moves to strike "The portions of the Schlesinger report on which cross-examination was not conducted pursuant to the Court's direction". [22] We have no idea what this motion means and therefore *152 cannot grant it. We confirm what we stated at trial that the report contains much unnecessary, irrelevant material, which we will disregard in reaching our conclusions on the issues tried. However, we cannot exclude from evidence what we cannot identify. If respondent had directed our attention to the material in the report which he now seeks to exclude as irrelevant, we would have been inclined to grant his motion. But even if he had directed our attention to relevant material in the report upon which he had declined to cross-examine Dr. Schlesinger, we would remind him that we did not prevent respondent from cross-examining Dr. Schlesinger on relevant material; we simply informed the parties of our resolve to stick to the issues as framed in our Scope of Trial Order. Accordingly, the entire report is admissible. We will, however, disregard those portions of the report that we deem to be irrelevant in deciding the issues at hand. *153 (b) Sidney Davidson: Exhibit 2022. Respondent correctly points out that Dr. Davidson's report was admitted during examination of respondent's expert Dr. M. Sabry Heakal. Dr. Davidson did not testify, and petitioners have conceded that his report should be excluded. The Davidson report will be excluded from evidence. Similarly, the testimony of Dr. Heakal that relates to Dr. Davidson's report also will be excluded. Tr. p. 2560, line 11 through p. 2564, line 7. (c) Richard N. Cooper: Exhibit 2002, pp. 41-43; related testimony at Tr. 717-718. Respondent in his Motion asserts that Dr. Cooper was qualified as an expert in economics and international economics and was not qualified to testify on matters of Saudi Arabian and international law. Petitioners respond that Dr. Cooper did not give opinions on the Saudi legal system or international law, and that, because of his role as Under Secretary of State for Economic Affairs during the relevant period, he was qualified to testify about the existence and scope of the restriction, about its sovereign nature, and about petitioners' inability to ignore it. [23]
*154 Dr. Cooper's testimony at the pages in the transcript objected to by respondent indicates that his assertions were all prefaced with his "understanding" of Minister Yamani's authority and the roles of the King and Crown Prince. To the extent that his (and his government's) understanding of the existence and scope of the restriction is relevant to the issues herein, Dr. Cooper was clearly qualified to testify on these matters. We also believe that respondent has inaccurately characterized Dr. Cooper's expertise. While the resume appended to his report clearly indicates that he has an extensive background in economics and international economics, his regular contact with Saudi officials also made him particularly qualified to testify as to his understanding of the Saudi restriction based on his discussions with those officials. We assume that respondent's objection lies in Dr. Cooper's "opinion-like" conclusions based upon factual assertions at the end of his report. The line between "expert" and "fact" witnesses has been one not subject to clear demarcation in this proceeding, largely because a number of those people who served at high levels of government during the years at *155 issue were highly qualified individuals whose expertise qualifies them not only to testify as fact witnesses about their recollections but also as experts about their judgmental conclusions as well. Given its highly probative value if found to be credible and consistent with the evidence overall, we do not believe that the experience and expertise of such witnesses should disqualify them from assisting the Court in ascertaining the scope of the restriction. This is perfectly consistent with rules 702 and 703 of the Federal Rules of Evidence concerning the scope of testimony by experts and the bases for their opinions. Rule 703, Federal Rules of Evidence, provides that the facts upon which an expert bases an opinion may be those perceived by the expert before the hearing. The facts upon which an expert may rely may be obtained in three ways: (1) Firsthand observation of the expert, (2) facts presented at trial, or (3) facts reasonably relied upon by experts in the field, which are presented outside the Court proceeding. Advisory Committee's Notes to rule 703, Federal Rules of Evidence; 3 Weinstein & Berger, Weinstein's Evidence, par. 703[01] at 703-5 (1975). See United States v. Hill, 655 F.2d 512, 516 (3d Cir. 1981). *156 Accordingly, the fact that Dr. Cooper perceived some of the facts upon which his conclusions are based through his employment as Under Secretary of State for Economic Affairs from 1977 to 1981 is completely permissible under the Federal Rules of Evidence,and the conclusions in his report are admissible. Their probative value is, of course, yet to be determined. (d) J. David Capers: Exhibit 2018, pp. 2-3, 19-20, 22, 26, and 29; related testimony at Tr. 1833-1836. Respondent alleges that Mr. Capers' report was beyond his expertise in that he was qualified as an expert in chemical engineering, petroleum operations and refining, and that the objectionable portions of Mr. Capers' report and testimony concern his "opinions on what actions were taken by the Saudi government, or the legal effects of such actions". Petitioners state that Mr. Capers made certain assumptions about the existence and scope of the restriction in examining the data in his report, and that he did not purport to have first-hand knowledge of these assumptions but was merely disclosing them, as required by Rule 143(f). They also assert that Mr. Capers' expertise was demonstrated in the areas of crude oil acquisition *157 and supply, crude oil transportation and delivery, refined product sales and product transportation and delivery. Therefore, they conclude that he was qualified to discuss in his report of Texaco's dispositions of Saudi crude, exchanges and processing agreements to determine whether they complied with the restriction as assumed in his report. Respondent appears to have missed the point of Mr. Capers' assumptions about the existence of the restriction, and we hereby assure respondent that we will not make the same mistake by relying upon those assumptions as the basis for our findings of fact concerning the existence and scope of the restriction. His explanation of the assumptions underlying his conclusions not only is appropriate, it is required by Rule 143(f), which provides: "The report shall set forth * * * the facts or data on which * * * [the expert's] opinion is based." Mr. Capers' statements in connection with the restriction and its scope were clearly in furtherance of that requirement and thus are admissible. With regard to the scope of the witness' expertise, his report indicates that he managed crude oil acquisition and supply, transportation and delivery, refinery *158 operations, and product sales, transportation and delivery for CKB and Associates, Inc., and then founded his own consulting firm in the same area. His report analyzes Texaco's supply, distribution, and trading operations to conclude that Texaco did not violate the restriction as it was defined for him by petitioners. His report and its conclusions are within the scope of his expertise and will be admitted. (e) Harold M. Brewster: Exhibit 2009, pp. 2-5, 23-24, and 35; related testimony at Tr. 1281-1283 and 1288-1289. Respondent's objection to Mr. Brewster's report and testimony is that the witness' expertise in "economics, marketing and petroleum operations" was not within the scope of his testimony about the actions taken by the Saudi government or the legal effects of those actions. Petitioners respond that Mr. Brewster's testimony was based upon his personal understanding and experience gained in his capacity as an Exxon employee during the relevant period. We agree with petitioners. Some of the portions of the report and transcript objected to by respondent and referenced in respondent's appendix have nothing to do with expertise or qualifications. They are statements *159 of understanding made by an employee who had been given certain instructions about the restriction and who drew certain conclusions from those instructions about how to handle interaffiliate sales prices. Thus they are admissible under Rule 143(f). Whether the instructions were an accurate description of the restriction is one of the issues before us and will have to be proven by the record. Mr. Brewster's review of company records in his report to determine whether the restriction was complied with is within the expertise of a concededly qualified expert in "economics, marketing, and petroleum operations". Respondent's objection is overruled. (f) Joseph A. Stanislaw: Exhibit 2008, p. 1 par. 4; p. 22 sec. V(C) and note 17; p. 23 sec. V(D) and note 18; p. 26 sec. V(G); related testimony at Tr. 1190. Respondent's objection to portions of Dr. Stanislaw's report and testimony is based upon the position that the witness was qualified as an expert in economics and thus was not qualified to testify about the restriction. At trial, Dr. Stanislaw was proposed by petitioners as an expert in "the energy policies of the [International Energy Agency], the [European Community], and the *160 summit countries during the years 1977 to 1981, with particular reference to the oil-monitoring efforts of those institutions and member countries of those institutions". His report was received into evidence, at which time respondent made no objection either to the witness' qualifications or to the content of his report. Dr. Stanislaw's testimony indicates that his knowledge of Saudi oil policies came from public records, information made available to him and his work with the International Energy Agency. He thus was justified in basing his report upon information that came at least in part from his personal observation and experience and was qualified to testify in connection therewith. The report and testimony will be admitted. (g) Toyoaki Ikuta and Norio Tanaka: Exhibits 2011 and 2011-A, pp. 1 and 23-25; related testimony at 1573-1574. Respondent's objection to Mr. Ikuta's testimony is the same as the objections to Mr. Brewster's and Dr. Stanislaw's reports -- that his observations about actions taken by the Saudi Government and the legal effects of those actions were beyond his expertise as an expert in "economics". Our ruling on this objection likewise is the same. *161 At trial, Mr. Ikuta was proffered as "an expert in the energy policies of the Government of Japan during the second oil crisis and the treatment of Saudi Arabian crude oil imports under those policies", and respondent indicated that he had "no objection to the fact that Mr. Ikuta is qualified as an expert in this area". As such, he was clearly qualified to testify about his understanding of Saudi oil policies, including his perception of the restriction. In addition, Mr. Ikuta served as President of the Japanese Institute of Energy Economics during the relevant period, in the course of which he indicated that he learned from his own observations about Saudi oil policies. He clearly was qualified to testify concerning these observations. Mr. Tanaka apparently worked with Mr. Ikuta in the preparation of the report. The report and testimony will be admitted. (7) James W. Kinnear Testimony and Exhibits: Exhibits BCN=BEH; related testimony at Tr. 3564-3692. During trial, respondent attempted to introduce into evidence during examination of Texaco's president certain documents referring to the lack of profitability in Japan of one of Texaco's 50-percent-owned companies, Caltex. *162 After eliciting from the witness statements to the effect that Caltex had not sold Saudi crude at prices higher than OSP, respondent sought to show by means of the documents at issue that Caltex was trying to increase its profitability by selling Saudi oil at a price above OSP to the Japanese. Respondent urges us to admit these materials because the series of transactions described therein purportedly demonstrates that Caltex (and therefore Texaco) violated the Saudi restriction by exacting numerous additional types of consideration from the Japanese for their purchases of Saudi crude. Although the Court originally received some of the documents as impeachment material, we later ruled that they would not be received until the Court ruled on all evidentiary motions after trial, and thus the documents were lodged. We permitted respondent to examine Mr. Kinnear with respect to the lodged documents, and advised respondent that he should request in his evidentiary motion that the documents be received and explain why they do not violate the Standing Pre-trial Order. The Court stated that, unless the documents were truly impeachment documents, they would not be admitted into evidence. *163 We further advised respondent that, if the Court does not receive the documents, the testimony in connection therewith also would be stricken. The Standing Pre-trial Order issued in this case on May 2, 1990, contains the following clear requirement: Any documents or materials which a party expects to utilize in the event of trial (except for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 15 days before the first day of the trial session. The Court may refuse to receive in evidence any document or material not so stipulated or exchanged, unless otherwise agreed by the parties or allowed by the Court for good cause shown.
The deadline for document exchange in this case was March 15, 1991. The documents at issue were not identified by respondent until late in the trial, long after petitioners had completed their case and long after the March 15 deadline. One explanation that respondent has given for his failure to identify these documents much earlier in the proceeding is that they constituted "rebuttal" evidence, by which we assume he means evidence to counteract or dispute evidence presented by petitioners *164 in their case-in-chief. Respondent argued at trial that Mr. Kinnear was a "rebuttal witness for the Government to rebut and to impeach Mr. DeCrane's testimony" that Caltex complied with the restriction. We conclude that the only logical interpretation of the Standing Pre-trial Order is that the parties should be permitted to respond by means of rebuttal to an unanticipated argument or evidence that arises during trial; thus we view the requirement in that order of the early exchange of documents to contain something of a "surprise" exception. We so indicated our perception of rebuttal at trial. The interpretation proposed by respondent that any material which "rebuts", or contradicts, evidence offered by petitioners does not have to be identified in advance of trial would necessarily require petitioners in all cases to disclose all evidence in advance but allow respondent in all cases to withhold evidence until after petitioners have finished their case-in-chief. This clearly is not the intent of the Standing Pre-trial Order, and we refuse to interpret it in such an unfair manner. With this interpretation in mind, we note that this was not a case of surprise. Nothing could *165 have been more easily predicted by respondent than that petitioners' witnesses would testify about petitioners' adherence to the restriction. It had been disclosed clearly during discovery and in expert witness reports. Therefore, this is not the type of unanticipated material that could not have been disclosed earlier, and it should have been disclosed in advance of trial. See Barkley Co. v. Commissioner, 89 T.C. 66, 70 (1987). Respondent also argues that the documents are impeachment documents, which are expressly excluded from the document exchange requirement of the Standing Pre-trial Order. We expressed some concern at trial that respondent was merely searching for a theory by means of which to get the documents into evidence. However, if they truly are impeachment documents, we will admit them for the limited purpose of contradicting Mr. Kinnear's testimony at trial, although they may not be used as substantive evidence. If they are not impeachment documents, they will be excluded altogether. Rule 607 of the Federal Rules of Evidence provides: "The credibility of a witness may be attacked by any party, including the party calling the witness." Under *166 the dictionary definition, "impeachment" is "To call in question the veracity of a witness, by means of evidence adduced for such purpose, or the adducing of proof that a witness is unworthy of belief". Black's Law Dictionary 678 (5th ed. 1979). In the first place, these documents do not appear to be truly inconsistent with Mr. Kinnear's testimony. For example, one document indicates that a certain type of low-sulfur crude was "in surplus" in early 1980. This was used to impeach Mr. Kinnear's statement that during the 1979-1980 period Texaco was short of low-sulfur crude, although he also indicated that there were "some times and some brief periods within 1980 when the situation had swung the other way". Assuming that the existence of low-sulfur crude is even relevant to the issues, we do not see a clear inconsistency. When asked about other documents, Mr. Kinnear explained that he saw nothing inconsistent between the desire of Caltex officers to increase the profits of an unprofitable company and compliance with the restriction. He also indicated that the attempts to increase those profits were unrelated to the restriction. While there are indications in several of the proffered *167 documents that Caltex was dissatisfied with its return on sales of crude to the Japanese,and wished to increase that return, the documents do not indicate, as respondent apparently would have us believe, that this desire to increase profits necessarily translates into violation of the restriction. In one of the documents at issue Mr. Kinnear appears to have stated to the Japanese that Caltex was not making enough of a return on the low -cost oil supplied to them, which presumably refers to Saudi oil. It does not urge, however, circumvention of the restriction but expresses awareness and caution concerning it. Other documents talk about Caltex's "substitution" of more expensive crudes for Saudi crude supplied to the Japanese in order to increase profits. But these documents do not necessarily prove that Caltex planned to use these substitutions in circumvention of the restriction. In fact, Mr. Kinnear testified that the total supply of Arabian crude to the Japanese during this period was constant and had been approved by the Japanese authorities. Moreover, it is not evident to us that such substitutions were sufficiently significant to cause us to hold that the restriction was *168 "violated" for purposes of this entire case, particularly since one document indicates that substitutions constituted less than one-fourth of 1980 supplies of Arabian crude to Japan. Other documents refer to "premiums" and the "benefit of the two tier price system" that might be lost. Still other documents refer to "deposits" to be made by the Japanese. Yet neither the documents themselves nor Mr. Kinnear's testimony draw the necessary link between these arrangements and the restriction. We do not hereby rule whether such activities, even if proven to have occurred, would violate the restriction, but they are not so inconsistent with Mr. Kinnear's testimony as to impeach his credibility. In addition, we are troubled by respondent's tactics in presenting these documents so late in the trial. Most circuits have adopted the logical rule that evidence which is inadmissible for substantive purposes may not be deliberately introduced under the guise of impeachment. See, e.g., United States v. Gomez-Gallardo, 915 F.2d 553, 555-556 (9th Cir. 1990); United States v. Peterman, 841 F.2d 1474, 1479 (10th Cir. 1988) (and cases cited therein). While *169 most of the cases employing this rule are in a criminal context, it has been applied to civil cases as well. See Whitehurst v. Wright, 592 F.2d 834, 839 (5th Cir. 1979). [24] Accordingly, we will examine whether respondent's primary purpose in calling Mr. Kinnear to the stand was to call a hostile witness and genuinely impeach that witness' testimony or was a subterfuge to elicit material that would otherwise be inadmissible because it was not shown to petitioners at a much earlier date. If the primary purpose was to elicit otherwise inadmissible evidence, [25] the testimony and documents should be excluded.
*170 We already have indicated why we do not believe these materials were so inconsistent with Mr. Kinnear's testimony as to impeach his credibility. We also find it obvious that respondent did not put Mr. Kinnear on the stand to elicit testimony that was favorable to his case. Respondent knew long ago that petitioners had taken the position that the restriction had been complied with, and it seems easily predictable that Texaco's president would so testify. There was no indication from respondent that he expected any different testimony than we heard, and in fact respondent's counsel stated on the record that it was "illogical" to assume that Mr. Kinnear would testify consistently with the documents she offered into evidence to impeach him. While surprise is not a prerequisite to impeachment, the expected testimony certainly is an indication of respondent's purpose in calling Mr. Kinnear to the stand. See United States v. Peterman, supra at 1480. Another indication of purpose is the fact that Mr. Kinnear does not appear to be a "crucial" witness whose testimony needed to be impeached. To discredit Mr. Kinnear's factual assertions and conclusions about compliance *171 with the restriction would serve no purpose in support of respondent's case, for, according to respondent's memorandum, several other witnesses testified to the very same statement that Caltex had complied with the restriction, and they were not similarly "impeached" during their testimony with similar documents. We think it likely, therefore, that respondent "held back" from introducing these documents until late in the trial in an effort to obtain a tactical advantage. To introduce these documents this late in the trial deprived petitioners of an opportunity to disprove or explain their contents through their witnesses at trial under circumstances where there was no legitimate reason for a last-minute submission. This was a clear example of "subterfuge" if ever there was one. We find that respondent is attempting to convince the Court to receive, under the guise of impeachment, material that was intended to be used as substantive evidence and that was not exchanged properly under the procedures set out in the Standing Pre-trial Order. We have ruled that we will not permit that order to be so disregarded. Compare Goldsmith v. Commissioner, 86 T.C. 1134, 1136-1137 (1986) *172 (Court admitted exhibits despite respondent's failure to comply with Standing Pre-trial Order because "petitioners' trial preparation was similarly nonexemplary"). This is not "good faith impeachment" but is an attempt to force otherwise inadmissible evidence through the "back door". 1 Saltzburg & Martin, Federal Rules of Evidence Manual, at 568 (1975). The documents and Mr. Kinnear's testimony in connection therewith will be excluded from evidence. (8) Kirby Ellis Subpoena: On March 21, 1991, respondent served on Mr. Kirby Ellis, a former attorney in the Exxon law department, a subpoena, which was accepted on behalf of Mr. Ellis by counsel for Exxon. On April 22, 1991, counsel for Mr. Ellis filed a motion for leave to file a motion to quash the subpoena, which was granted by the Court on the same day. On April 23, 1991, Mr. Ellis filed a motion to quash the subpoena, alleging that any testimony he could give related to the issue for which respondent had identified him would require him to invoke the attorney-client privilege and possibly the work-product doctrine. On April 24, 1991, respondent filed a notice of objection to the motion to quash, alleging that Mr. Ellis *173 had waived the privilege by providing respondent during discovery with a copy of a memorandum (Exhibit IO), which describes materials that "merit inclusion as a part of the EME annual legal review". At trial on April 25, 1991, the Court orally granted the Motion to Quash. Paragraph 2 of Exhibit IO, entitled "SAG Directives", contains a reference to the Saudi requirement that "sales by the offtakers to third parties not exceed the government-established price". Other than this reference, the document contains nothing that even appears to be relevant to the issues before us. Respondent apparently takes the position that mere disclosure of this document constitutes a waiver of the privilege. In their response, petitioners contend that no waiver occurred because waiver of attorney-client privilege only occurs when confidential information is disclosed, and Exhibit IO did not contain any confidential information. They contend that the document "merely paraphrases Saudi directives in response to a request for materials meriting consideration in an annual antitrust legal review". They further allege that nonprivileged testimony that could legitimately be obtained from an examination *174 of Mr. Ellis would duplicate testimony that could more easily be obtained from other witnesses. We can understand respondent's desire to probe the use of the "third parties" language in Exhibit IO. Such a probe would, however, clearly fall within the realm of the attorney-client privilege, since it would involve disclosures made to Mr. Ellis by his client which were "necessary to obtain informed legal advice -- which might not have been made absent the [attorney-client] privilege". Fisher v. United States, 425 U.S. 391, 403 (1976). Respondent contends, however, that the mere provision of Exhibit IO by Exxon in the course of discovery was not inadvertent and by this we assume he means that it constituted a waiver of the attorney-client privilege or an admission that discussions concerning the scope of the restriction can be appropriately discussed. We agree with respondent up to a point. By providing respondent with a copy of the memorandum, petitioners waived the privilege with respect to the subject matter contained in Exhibit IO, and Mr. Ellis could be asked questions about that subject matter. McCormick on Evidence, sec. 93, at 224 (3d ed. 1984); 8 Wigmore *175 on Evidence, sec. 2327, at 638 (McNaughton rev. 1961). The subject matter of the memorandum, however, is not relevant to the issues we are trying; the memorandum speaks only about the suggested topics of a meeting. We are not interested in a meeting here; we are interested in the restriction. The fact that the restriction may have been on the agenda for a meeting to take place in the future does not mean that all topics discussed at that meeting are subject to disclosure. In United States v. O'Malley, 786 F.2d 786 (7th Cir. 1986) a client informed the FBI that he had discussed certain information with his attorney. The Court of Appeals for the Seventh Circuit distinguished between the fact of disclosure and disclosure of the communications themselves, stating: "A client does not waive his attorney-client privilege 'merely by disclosing a subject which he had discussed with his attorney.' In order to waive the privilege, the client must disclose the communication with the attorney itself." United States v. O'Malley, supra at 794 (quoting 2 Weinstein & Berger, Weinstein's Evidence, Advisory Committee's Note to Standard 511 at 511-2 (1984)). *176 We make the same distinction here and find that Mr. Ellis did not, by disclosing the fact that a subject should be on the agenda for a future meeting, disclose the contents of that meeting or his thoughts in connection therewith. Accordingly, there was no waiver. [26]
Since, if Mr. Ellis had been called to testify he would not have been able to testify as to any nonprivileged matters relevant to these issues before us, it was appropriate *177 to quash the subpoena and we reaffirm our ruling. Petitioners' Motion
(1) Evidence regarding profitability: Exhibits BCH, QV-RH, RJ-SI, SZ, TE, TI, UY-UZ, VU, VZ, WC, WE, WI, WT-WV, XF,YK, API-APM, ARN-ART, ARY, ASB-ASC, ASI, Z-EM-Z-EN, Z-EP-Z-ES, portions of Exhibits BBI, BCF, BCE, and portions of the testimony of witnesses Spiro, Ashton, [27] Brewster, and Austin. [28] In the first section of their Motion to Strike (section A), petitioners seek to exclude various exhibits and portions of trial testimony concerning the profits earned by petitioners from sales of the low-priced Saudi crude on the ground that the "Court specifically excluded [them] from trial by its January 7 Order and which petitioners accordingly refrained from addressing". The Scope of Trial Order provides that at this phase of the proceedings the parties will limit their presentation of evidence and testimony to the questions set forth in this Order, all of which relate to the Aramco Advantage and will not make any presentation as to the amount of income which respondent alleges was shifted or what the transfer price should have been, absent the pricing restrictions.
We indicated at trial *178 on a number of occasions that we would not consider evidence on the amount of profits made by petitioners during this phase of the proceedings. While respondent apparently still contends that the Scope of Trial Order was overly restrictive, [29] he provides the following explanation to link the evidence on profits which petitioners now seek to exclude to the language of that Order: Since petitioners' extraordinary profits during 1979 through 1981 were a matter of public record, the Saudis and certainly Minister Yamani had to know who was benefiting from the lower price Saudi crude. The Saudis' failure to impose any sanctions or to make any attempt to require the benefit of the lower price Saudi crude to be passed on to consumers belies the existence of any real restriction. The point of respondent's presentation was not to show the exact amount of profits secured by petitioners' offtakers, but to show that the restriction which petitioners alleged was imposed by Saudi Arabia was superficial at best and was used by petitioners to justify the shifting of profits from their offtakers (subject to United States tax) to petitioners' controlled foreign corporations which were beyond *179 the reach of United States tax.
Respondent's Memorandum in Support of Objection to Petitioners' Motion to Strike at 5-6. On April 3, 1991, the parties entered into a stipulation which provided in part: "Profits were realized by one or more of petitioners' subsidiaries and such profits *180 reflected the benefit of the below market purchase price of the oil from Saudi Arabia." Stipulation of Facts -- Exxon and Texaco, par. 82. In response to a letter to the parties from the Court on November 14, 1991, petitioners have indicated their willingness to admit further that: Substantial profits were realized downstream by one or more of petitioners' refining/marketing subsidiaries, and such profits reflected the benefit of the below market purchase price of the oil from Saudi Arabia.
Respondent urges us not to accept this admission in lieu of the materials on profits because part of his "superficiality" argument involves profits earned by petitioners' offtakers, which petitioners' admission does not address. We find that respondent has drawn the requisite link between the issues before us and the "profits" materials and testimony in paragraph A of petitioners' Motion to Strike. Therefore, these materials and testimony will be admitted. We caution respondent that this does not mean that we are necessarily persuaded by his "superficiality" argument. Nevertheless, in the interest of allowing respondent to present his case in the most effective way that he sees fit, *181 we will admit these materials into evidence. We urge the parties to address very specifically in the next round of briefs the content of these materials as they relate to respondent's "superficiality" argument, for it is only in the context of this argument that we will deem them at all relevant to the issues we are presently trying. As the Court stated repeatedly during trial, the amount of profits earned by petitioners is not relevant at this time. Respondent's argument that petitioners earned enormous profits as a result of the lower priced Saudi oil may or may not disprove the existence of the restriction or the application of Procter & Gamble. Our ruling at this time is only that we are willing to allow respondent to make his argument. Petitioners in their Motion to Strike urge us to reject this evidence in part because, in compliance with our Scope of Trial Order, they did not attempt to rebut any of respondent's "profits" evidence. Therefore, we informed the parties that we were considering admitting these materials and gave petitioners an opportunity to supplement the record with additional evidence. They declined to do so, indicating that they did not think *182 it was necessary at this time. Accordingly, petitioners have waived their right to submit further evidence on profits at this stage of the proceeding. In the event, however, that this case proceeds to the next phase, petitioners will have an opportunity to present evidence on profits anew. With regard to those portions of paragraph A of petitioners' Motion to Strike that relate to materials on comparable crude oil transfer prices in the absence of a restriction, we will grant petitioners' motion. [30] Respondent has not convinced us that these materials are related to the issues before us, and they were expressly excluded by the statement in our Scope of Trial Order that the parties would not make any presentation as to "what the transfer price should have been, absent the pricing restrictions". Therefore they will be excluded. In the event that we are required to address these questions at a later stage of the proceeding, we will do so with a full and complete record. *183 (2) Certification and Restriction Documents: Exhibits CCJ, CCM-CCN, CCQ, CCS-CCU, CCW-CCZ, CDA, CDC, CDF, CDH-CDJ, CDN-CDQ, CDW-CDX, CDZ, CEB-CEF, CEH, CEN, CET, CEV-CEW, CFB, CFM, CFS, CFY-CFZ, CGC-CGD, CGK-CGL, CGQ, CGV. Exxon objects to the receipt of these 45 documents [31] on the ground that they were offered in violation of our Standing Pre-trial Order. Claiming that most of the documents (which are from Exxon files) were produced to respondent before February 6, 1991, Exxon asserts that respondent did not identify any of these documents for use at trial until April 6, 15, 25, and 26, 1991, and did not submit a final set of the documents until the last day of trial. Respondent claims that he identified and provided petitioners with most of these documents prior to April 6, and they were offered into evidence 19 days later. During trial respondent stated that there had been an unwritten understanding among the parties as they were engaging in the stipulation process that additional documents concerning the restriction and certifications would be necessary, and that he believed petitioners understood that, if these documents were not stipulated to, they would be offered *184 into evidence by respondent. Petitioners disputed these statements. Because of the parties' disagreement as to the facts, the Court reserved ruling on the ultimate admissibility of the documents and allowed them into evidence, subject to petitioners' Standing Pre-trial Order objection. We indicated that petitioners' objection based upon respondent's violation of the Standing Pre-trial Order appeared to be well-taken unless respondent could show that the documents were true "rebuttal" documents in the sense that they address unanticipated evidence that arose during petitioners' presentation. We strongly believe that the terms of the Standing Pre-trial Order should be enforced here. If respondent is correct *185 that there were certain "understandings" between himself and counsel for petitioners, he should have taken the appropriate step of obtaining such assurances in writing. However, we think it unlikely that there was such an agreement undertaken by petitioners to stipulate to documents throughout trial, particularly in light of the difficulty the parties had in reaching any agreement on stipulations in this case. The record also would seem to indicate that such understandings were not reached in connection with these documents. If there were no such understandings, then the Standing Pre-trial Order should have been adhered to, as we have discussed earlier in this opinion. We find no validity in respondent's argument at trial that it is incumbent upon petitioners to know their documents and therefore respondent's disregard of the Standing Pre-trial Order did not prejudice or surprise petitioners. Such an interpretation, at least in cases like this where the record is very extensive, would render the document exchange requirement in the Standing Pre-trial Order meaningless. Accordingly, petitioners' motion is granted and the documents are excluded. Any testimony specifically addressing *186 the contents of those documents likewise is excluded. (3) Hugh David Frisbie Revised Report and Testimony: April 22, 1991, Exhibit BCA; related testimony at Tr. 2533-2537. Respondent provided petitioners and the Court with a copy of Mr. Frisbie's first report, Exhibit BCA dated February 12, 1991, in a timely manner, with a cover letter that stated: We are aware and have seen a new crude sales ledger that was provided by Texaco Inc.; however, we have been unable to verify the source or accuracy of differences between the two ledgers. Other documents received after that date could not be incorporated into our report given the due date. The effect of any documents provided to us after February 5, 1991 will be reflected in addenda to our report, in supplemental reports, or in my testimony at trial.
Petitioners claim that, late in the evening preceding Mr. Frisbie's testimony in this case, respondent provided Texaco's counsel with a revised report, which apparently was based upon more accurate data that was received by Mr. Frisbie either after he submitted his original report or too close to the due date of his original report for him to incorporate it into this earlier *187 version. Respondent clearly could -- and should -- have provided petitioners with a copy of Mr. Frisbie's revised report some time substantially earlier than he did. Updating an expert's report with newly-discovered data is, of course, perfectly appropriate. However, we cannot believe that the report could not have been updated by Mr. Frisbie and supplied to petitioners substantially before 11:00 o'clock the night before Mr. Frisbie's expected testimony. Even if we accept respondent's representation in his memorandum that the revised report is based upon data received from petitioners on April 16, 1991, either the data should have been incorporated immediately or respondent should have advised petitioners that an amended report was forthcoming and given petitioners the opportunity to review that report for a few days before expecting cross-examination of Mr. Frisbie to occur. Nevertheless, we find that petitioners' ability to cross-examine Mr. Frisbie was not significantly impaired within the meaning of Rule 143(f), since they appeared to be prepared with questions concerning the amended report. This finding is, we might add, testimony to their diligence. In addition, respondent *188 might have asked the Court to invoke the provision of Rule 143(f), which states that "Additional direct testimony with respect to the report may be allowed * * * to cover matters arising after the preparation of the report" and then asked Mr. Frisbie to indicate whether the figures received on April 16 changed the conclusions of his report. Had respondent employed this route, petitioners would have been even less prepared. We note for the record that his conclusions in the first report did not change in the second report as a result of the updated figures. Accordingly, the amended report and testimony related thereto will be admitted. (4) Hugh David Frisbie Chart and Related Testimony: Exhibit BCB; related testimony at Tr. 2537-2548. Respondent apparently concedes that this chart was not identified or exchanged before trial as required by the Standing Pre-trial Order. He does not contend that it constitutes impeachment material. His sole argument in favor of admitting the chart is that it "is nothing new", it "explains" part of Mr. Frisbie's report, and that its purpose was "to rebut petitioners' allegations of compulsion by SAG, to show that SAG was not interested in controlling *189 interaffiliate billing prices, and to clarify Mr. Frisbie's testimony" about the last-minute revisions to his report. He further adds that its contents "could not have come as any surprise to petitioners". Once again respondent has mistaken the purpose of the document exchange requirement of the Standing Pre-trial Order. That the contents of the document may be familiar to petitioners does not relieve respondent from his obligation to identify before trial those documents he intends to introduce into evidence, in order to give petitioners an opportunity to know in advance the scope of their case and to be adequately prepared for cross-examination. There was no true rebuttal here in the sense of testimony that could not have been reasonably anticipated. Therefore petitioners' objection will be sustained and the document and related testimony will be excluded. (5) Peter K. Ashton Chart: Exhibit BCG. Petitioners in their Motion to Strike object to admission of this chart on the ground that it was not exchanged before trial. However, they made no such objection during trial when it was introduced, and the document was received into evidence without qualification. We hold *190 that petitioners have waived their objection to this document and accordingly it is admitted. (6) Paul L. Bloom Report: Exhibit BBG. The parties agree that, since Mr. Bloom did not testify, his report should be excluded, and we so hold. We also hold that Dr. Schlesinger's testimony from page 471, line 20, through page 473, line 23, which deals with his reactions to certain statements in Mr. Bloom's report, will be stricken. The explanatory discussion from page 473, line 25, through page 478, line 10, will not be stricken as requested by respondent because it is capable of being understood apart from any reference to the Bloom report. For the same reasons, Mr. Seymour's testimony from page 1102, lines 17 through 25, will also be stricken. (7) Frank E. Vogel Attachments to Almihdar Report: Exhibit BBE, attachments. The parties agree that Mr. Vogel's letter and resume are not properly attached to Mr. Almihdar's report. The attachments to Exhibit BBE are excluded. (8) M. Sabry Heakal Report and Related Testimony: Exhibit BCC; related testimony at Tr. 2551-2577. Dr. Heakal's expert report concludes that, because of the relationship between the Texaco offtaker, TexTrad, *191 and the related companies to which some of the Saudi oil was sold, those sales cannot be presumed to be at "arm's length", and the accounting treatment of the sales of Saudi oil should be modified under Generally Accepted Accounting Principles (GAAP) to reflect the economic substance of the transactions. On the day prior to Dr. Heakal's trial testimony, petitioners filed a motion to strike this report on the ground that the subject of that report "is not relevant to the tax issues before the Court at the April 1 trial". The Court then indicated its view that it agreed with petitioners' position and would probably grant the motion. Petitioners reiterate their position in their Motion to Strike. Respondent does not indicate in his memorandum how GAAP are relevant to the issues before us and merely attempts to distinguish a case cited by petitioners and to add that "Dr. Heakal's report and testimony confirm that, like substance versus form principles of tax law, a basic feature of financial accounting is emphasis on the economic substance of events over their form." Rule 702 of the Federal Rules of Evidence provides: If scientific, technical, or other specialized knowledge will *192 assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
While it may contain some interesting points about accounting principles, Dr. Heakal's report does not meet this standard for two reasons. First, GAAP are not relevant to a "fact in issue" here -- the restriction, its scope, and the extent to which it was complied with, as described in our Scope of Trial Order. As defined in rule 401, Federal Rules of Evidence, relevant evidence has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". How items are -- or should be -- accounted for under GAAP is not an issue that we need to consider at this time. It may or may not be relevant to a later phase of this proceeding, should there be one, but it has no bearing on this phase. Second, the report does not contain "specialized knowledge" which will assist the Court in determining the facts before us. Other than the discussion of *193 GAAP, which is irrelevant, the report is nothing more than a brief in support of respondent's "substance over form" position. It contains pure argument which we will find perfectly acceptable in respondent's next brief on the merits, but unacceptable in an expert's report. Therefore Dr. Heakal's report will not be admitted as an expert report, and his testimony likewise will be excluded. (9) German Tax Refund Claim: Exhibits APN, APO, and APP. These documents relate to a tax refund suit filed with the German Government by Texaco's former German subsidiary, Deutsch Texaco AG. Petitioners assert that "The existence of that claim and the tax position taken by Texaco's former affiliate with respect to German taxes are irrelevant to the issues specified in the Court's January 7 Order." They raise no other objections in their Motion to Strike concerning this material. We stated at trial that the position of the German tax authorities is irrelevant to the issues before us. We adhere to that position now. However, statements of fact by Texaco concerning compliance with the restriction may be relevant. One of the documents at issue, which is part of a 1987 letter from Deutsch Texaco *194 AG's attorneys to the German Revenue Office, calls into question petitioners' assertions about compliance with the restriction: "The industry of course found ways and means to circumvent the price limit of the Saudi Government." Exhibit APO, at T-77309. Whether this statement is true or, even if true, proof that the restriction was superficial or otherwise nonexistent, is not an issue we must decide today. We need only decide -- and we do so decide -- that the statement in Exhibit APO may be relevant, and therefore it is admissible. With regard to the other two documents, Exhibit APN appears to indicate that Texaco authorized the Deutsch Texaco AG attorneys to institute the tax refund litigation. Although it does not specifically authorize the factual assertion that the industry circumvented the Saudi restriction, it does show a general awareness on Texaco's part of that proceeding, and therefore it will be admitted. Exhibit APP shows an involvement on the part of Texaco in that proceeding by the provision to its German affiliate of data concerning the "Aramco advantage/disadvantage" during the years at issue, and we will admit it as well. We caution the parties that, while *195 we will admit these documents, this does not indicate that we thereby hold that the German refund proceedings are to be exhaustively argued in the next round of briefs. The only reason that these proceedings are at all relevant is that statements by petitioners' agents concerning the scope or existence of the restriction apparently were made in connection therewith, and those statements may be relevant. Any discussions beyond the scope of relevance will not be considered. (10) Fariborz Ghadar Report: Exhibit BCD. This report provides a description of the historical relationship between Aramco and the SAG. Petitioners allege that the central conclusion of the report, that after January 1, 1976 "ARAMCO was no longer a concessionaire but a service company", is irrelevant to the issues before us. Respondent claims that the report is relevant to issue (7) of the Scope of Trial Order, in that the restriction, even if valid and followed, was more in the nature of a contractual arrangement than a "law"; therefore, he concludes, a section 482 or section 61 adjustment would not be precluded under Procter & Gamble Co. v. Commissioner, 95 T.C. 323 (1990). We will *196 admit the report and allow respondent to make his argument. He draws a line of relevance between this report and the issues before us. While much of the historical discussion may not be necessary to understand respondent's argument about the nature of the relationship between petitioners and the SAG, we note that there is a good deal of similar historical discussion in the report of petitioners' witness, Dr. Schlesinger, which we admitted in its entirety earlier in this opinion. As we indicated earlier, we will simply disregard those portions of the reports that deal with irrelevant material. An appropriate order will be issued. Footnotes
1. Cases of the following petitioners were consolidated for purposes of trial, briefing, and opinion of the so-called "Aramco Advantage" issue on December 17, 1990, as amended by Order of January 7, 1991: Exxon Corporation and Affiliated Companies, docket No. 18618-89; Texaco Inc. and Subsidiaries, docket No. 24855-89; and Exxon Corporation and Affiliated Companies, docket No. 18432-90.↩
2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. For purposes of this opinion, the term "offtaker" will refer to the person or company that physically loads oil obtained under a concession, contract, or other arrangement. ↩
4. Contrary to the impression created by this title, the Court held the record open until all evidentiary issues were decided by this opinion. The record in this case will be closed upon release of this opinion.↩
5. We note, however, that there is some merit to respondent's contention that the business records exception requires that the proffered documents must have been prepared in the regular course of the author's business, not the receiving entity's business. See Snyder v. Whittaker Corp., 839 F.2d 1085, 1090 (5th Cir. 1988); Petzoldt v. Commissioner, 92 T.C. 661, 676-677↩ (1989).
6. On April 2, 1991, and April 3, 1991, respondent and petitioners, respectively, filed memoranda on the application of Rule 146↩ to this proceeding. For this opinion we have considered the material discussed therein, as well as authorities referenced in the memoranda accompanying the instant motions and responses.
7. As we have indicated, because we admit the documents under Rule 146, we need not address respondent's hearsay objections. However, while the documents may not be subject to the hearsay rule, we do not necessarily receive those documents as conclusive evidence of the statements made therein. Rather, in making our determinations on the merits of the issues in this case, they will be accorded weight that is consistent with their reliability. If they appear to the Court for some particular reason to be suspect or unreliable, we will take that into account, as we would with any other document admitted into evidence. See Chadwick v. Arabian American Oil Co., 656 F. Supp. 857, 861↩ (D. Del. 1987).
8. We note that, while respondent in his Motion seeks to exclude certain appendices to this report, he does not seek to exclude the report itself. On April 9, 1991, respondent filed a Motion to Exclude Report of Abdulaziz H. Fahad and Alternatively to Exclude Portions Thereof, asking the Court to exclude the entire report as beyond Mr. Fahad's expertise, or portions of the report for various reasons. The parties were informed in a conference call and subsequent letter on May 24, 1991, that the Court would consider only those evidentiary objections raised in the parties' evidentiary motions filed after trial. Respondent did not reference or renew his motion to exclude Mr. Fahad's report in the instant Motion; therefore, we find that he has waived his earlier objections.↩
9. Respondent also attempted to introduce the testimony of another expert, Dr. Frank E. Vogel, in support of Mr. Almihdar's testimony, but the Court refused to allow the witness to testify because he did not submit an expert witness report, contrary to the Court's Standing Pre-trial Order. Although respondent apparently continues to object to this ruling, we confirm it here. ↩
10. "Aramco" is an oil consortium composed of Exxon, Texaco, Mobil, and Standard Oil of California (now Chevron), which negotiates the concession agreements with the Saudis for the purchase of Saudi oil.↩
11. We note that respondent has appealed our decision in Procter & Gamble Co. v. Commissioner, 95 T.C. 323↩ (1990), but it still reflects the position of this Court.
12. As mentioned previously, because we have held that these documents are admissible under Rule 146, we need not address whether any of the hearsay exceptions discussed by the parties apply. However, we note that some of the hearsay discussion in respondent's memoranda emphasizes the inherent unreliability of certain documents, which is a subject in which the Court has a great deal of interest. We expect to see in their briefs on the merits a good deal of discussion from all parties as to why in formulating our findings of fact in the next opinion we should or should not rely upon documents admitted into evidence pursuant to this opinion. See supra↩ note 7.
13. See Continental Illinois Corp. v. Commissioner, T.C. Memo. 1989-468↩ (fact that documents were prepared for litigation did not detract from trustworthiness and tended to impress upon the makers of the documents the seriousness of the situation and importance of telling the truth).
14. These documents will be designated collectively as petitioners' Exhibit 2005(A).↩
15. It appears to the Court that respondent's refusal was not only arbitrary but unfortunate, since the opportunity offered to respondent might well have assisted respondent's counsel in their evaluation of the evidence. Counsel should remember that their obligation is not simply to win this litigation but to assist the Court in ascertaining the facts.↩
16. Rule 84(a)↩ requires that depositions taken in a foreign country must be taken on written questions unless otherwise directed by the Court for good cause shown.
17. Respondent does not object to the translation of this deposition, which was the only deposition at issue here that was not given in English.↩
18. Nor would the existence of such a writing necessarily have precluded admission of the deposition into evidence, as we discussed earlier in this opinion.↩
19. We note that petitioners misstate and quote out of context the Advisory Committee's Note concerning the scope of rule 28. The last sentence of Fed. R. Civ. P. 28(b) was added in 1963. It provides: Evidence obtained in response to a letter rogatory need not be excluded merely for the reason that it is not a verbatim transcript or that the testimony was not taken under oath or for any similar departure from the requirements for depositions taken within the United States under these rules.↩
The Advisory Committee's Note does not, as petitioners state, "allow a foreign deposition into evidence unless it is 'so devoid of substance or probative value as to warrant its exclusion altogether'"; rather, it indicates that the sentence merely was designed to allow material into evidence despite the use of different methods of taking or recording the testimony. The Advisory Committee's Note then states: "the testimony may indeed be so devoid of substance or probative value as to warrant its exclusion altogether."
20. Thus former Chancellor Schmidt's statement does not constitute an impermissible "ex parte affidavit" under Rule 143(b)↩, as respondent argues. See respondent's Memorandum in Support of Motion to Admit and Exclude Evidence and to Reopen the Record at 20.
21. Respondent also makes a statement in his memorandum that "it is not at all clear that the witness is unavailable" for purposes of Rule 81(i). In his deposition Mr. Van Rhijn stated that he had "no particular intention of coming to the United States if it would not be really necessary". This appears to us to be a statement of "unavailability", since we do not have the power to compel him to appear.↩
22. Respondent during trial filed a motion to exclude Dr. Schlesinger's report on the grounds that he did not testify as an expert under Fed. R. Evid. 702 but was testifying as to his recollections of the facts, much of which were based upon inadmissible hearsay; that cerain portions of the report are without analysis; that certain portions assume the existence of the restriction, which is the ultimate fact to be decided; that one sentence is beyond the knowledge and expertise of the witness, and its probative value is exceeded by its prejudicial impact so that it should be excluded under Fed. R. Evid. 403↩; and that the appendices to the report should be excluded as inadmissible hearsay. Petitioners did not file a response to this motion. In the instant motion, respondent did not raise any of these arguments, and we assume therefrom that they have been abandoned.
23. During trial, respondent filed a motion to exclude Dr. Richard N. Cooper's report on the grounds that, inter alia, much of it contained irrelevant material, that his conclusions were based on inadmissible hearsay, and that most of the appendices to his report should be excluded because they contained inadmissible hearsay. In their response to this motion, petitioners stated that Dr. Cooper's reliance upon hearsay and other inadmissible material was appropriate under Fed. R. Evid. 703, that all of the report contained relevant material, and that Dr. Cooper was required under Rule 143(f)↩ to provide the Court with the facts and data upon which he relied in reaching his conclusions. In the instant evidentiary Motion, respondent did not repeat any of the grounds of his earlier motion to exclude Dr. Cooper's report, and we assume therefrom that he has abandoned his earlier arguments.
24. We note that the potential for jury confusion is one obvious reason to exclude such evidence in jury trial cases. Nevertheless to allow admission of inadmissible materials here under the subterfuge of impeachment is extremely troublesome, even in the absence of a jury trial. Therefore we find it appropriate to apply a similar standard here. ↩
25. Respondent makes the arguments that the proffered testimony and materials are business records under Fed. R. Evid. 803(6) or admissions under Fed. R. Evid. 801(d)(2)↩ and thus may be used as substantive evidence. We need not address these theories, however, because our concern with these materials is not related to their hearsay problems; these materials are excluded as substantive evidence because of respondent's violation of the Standing Pre-trial Order.
26. Petitioners also make a reference to the possible application of the work-product doctrine, but we do not know at this point of any such "product" that has been requested, so the doctrine does not appear to be applicable. Moreover, the proof of waiver in the work-product context is more difficult than in the attorney-client privilege context. United States v. American Telephone & Telegraph Co., 642 F.2d 1285, 1299↩ (D.C. Cir. 1980). Therefore, our finding of lack of waiver in the latter case would necessarily mean we would find a lack of waiver in the former.
27. In their letter to the Court of December 19, 1991, petitioners withdrew part of their objection to Mr. Ashton's testimony, at Tr. 2809-2833. ↩
28. Petitioners' Motion to Strike also seeks to exclude portions of the testimony of Mr. Garvin, but petitioners withdrew this objection in their letter to the Court of November 27, 1991. ↩
29. See note 1 of Respondent's Memorandum in Support of Motion to Admit and Exclude Evidence and to Reopen the Record. While respondent calls the issues referred to in that footnote "continuing objections", we will not address them in this opinion because respondent chose not to do so. Therefore, our rulings on the scope of trial and the other matters referred to in that note are hereby affirmed.↩
30. As an attachment to their letter to the Court dated November 27, 1991, petitioners designated those portions of their Motion to Strike which deal with comparability. It is those items so designated that we refer to here.↩
31. Respondent claims that only 41 documents are in dispute. This is because Exhibits CEW and CGC are apparently identical to stipulated Exhibits IU and 529, and Exhibits CGV and CCY and Exhibits CGD and CDN are duplicates. Certain other related documents were conceded by petitioners to be admissible at trial.↩